UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

DANIEL PRESTON,                                          :

                            Plaintiff,                  :

        -against-                                       :       COMPLAINT

ABSECON MILLS, INC.,                                    :

                            Defendant.                  :
------------------------------------------------------------------x

        Plaintiff Daniel Preston, by his attorneys, Duane Morris LLP, for his complaint against

defendant Absecon Mills, Inc., alleges as follows:

                            NATURE OF THE CASE

        1.      This is an action for preliminary and permanent injunctive relief, breach of

contract, and a declaratory judgment.  It stems from the failure of defendant to pay plaintiff

hundreds of thousands of dollars in guaranteed minimum royalty payments under a license

agreement pursuant to which plaintiff provided defendant with trade secrets that allowed

defendant to manufacture fabrics with extraordinary anti-ballistic properties.

        2.      Defendant not only failed to make the requisite payments to plaintiff, but after

plaintiff terminated the license agreement based on defendant's breach, defendant continued

to use plaintiff's trade secrets – and it has stated that it intends to continue to do so.  As a

result of defendant's unauthorized and unlawful use of plaintiff's trade secrets, plaintiff

cannot ensure that his trade secrets are being protected, nor can he exercise quality control

over fabrics manufactured by defendant using plaintiff's proprietary technology, and the value

of the technology – and plaintiff's reputation – will suffer irreparable injury.  In order to

prevent such injury, plaintiff seeks to enjoin defendant from using proprietary technology

which belongs exclusively to him and to which defendant no longer has any right.

3.      The injunctive relief plaintiffs seeks is necessary to keep defendant from infringing his rights and to prevent the harm to the public that could result from the unauthorized use of plaintiff's technology.

## THE PARTIES

4.      Plaintiff Daniel Preston ("Preston") is an individual who resides in Brooklyn, New York. Preston is an inventor who has developed numerous technological processes and to whom many patents were issued.

5.      Defendant Absecon Mills, Inc. ("Absecon") is, upon information and belief, a corporation organized under the laws of the State of New Jersey and having its principal place of business at Aloe & Vienna Avenues, Cologne, New Jersey. Absecon is in the business of manufacturing fabric. Until it was introduced to Preston, Absecon had never manufactured any non-woven fabric and, with the exception of fabrics using the technology and trade secrets that are the subject of this action, Absecon only makes woven fabrics.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action pursuant to 28 U.S.C.§ 1332 since the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a)(1) and 1391(c) because Absecon consented to the jurisdiction of any state or federal court located in the State of New York, County of New York and, as such, is deemed to reside in this judicial district.

8.      Absecon is subject to personal jurisdiction in New York by virtue of having irrevocably consented to such jurisdiction.

<u>FACTS COMMON TO ALL CLAIMS</u>

9.      Preston invented and developed a new technology (the "Technology") for making non-woven fabrics with a unique anti-ballistic quality (the "Fabrics"). The Technology involves a secret process for making armor using customized machinery and special methodology for fabric design and construction. Because the Fabrics are lighter than standard body and other armor and have a lower backface deformation, the Fabrics have the potential to be used for a variety of specialized military and civilian purposes.

10.     Since developing the Technology, Preston has carefully guarded its secrecy. As a result, the Technology cannot readily be duplicated by others and constitutes a trade secret.

11.     Based on the Fabrics' unique qualities, the Technology has enormous value and gives anyone with access to it a competitive advantage over other businesses selling to customers in the defense and aerospace industries.

12.     Absecon had no role in the creation or development of the Technology. Indeed, before Preston agreed to give Absecon access to the Technology pursuant to the License Agreement described in Paragraph 10 below, Absecon had produced only woven fabrics and lacked the technical know-how to make a non-woven uniaxial fabric like the Fabrics.

13.     On August 19, 2010, Preston, as licensor, entered into a License Agreement with Absecon, as licensee (the "License Agreement"), pursuant to which Preston granted Absecon an exclusive worldwide license to use the Technology for a term of ten years, subject to earlier termination by either party following a breach by the other party. (A copy of the License Agreement is annexed hereto as Exhibit A and is incorporated herein.)

14.     Absecon acknowledged in paragraph 1 of the License Agreement that the Technology is a trade secret which belongs to Preston.

15.     In exchange for an exclusive license to use the Technology, Absecon agreed to pay Preston a royalty equal to 5% of the gross amount of collections Absecon received from the sale of Fabrics.  Paragraph 4 of the License Agreement provides for payment of the royalty not more than thirty days after the end of each calendar quarter with respect to collections received in such quarter.  The License Agreement further requires Absecon to provide Preston with a detailed statement setting forth how the payment amount was calculated.

16.     Pursuant to Paragraph 3 of the License Agreement, Absecon is required to pay Preston a minimum annual royalty of $500,000, payable quarterly in advance, of which the first $125,000 installment was due on signing and the second quarterly installment was payable on the earlier of the date on which Absecon received funding from the Office of Naval Research ("ONR") or 60 days after the second quarter of the first year would otherwise have begun.  The royalty payments of 5% of the gross amount of collections were to be reduced to the extent of the minimum annual royalty of $500,000 paid with respect to each such year.

17.     In keeping with the proprietary nature of the Technology, the License Agreement obligated Absecon to enter into a confidentiality agreement pursuant to which it agreed not to disclose the Technology to others and to use the Technology only for certain specific purposes.

18.     The License Agreement provides that it is "subject to early termination by either party after a breach . . . by the other party." (Exhibit A ¶ 2.)  In the event of termination of the License Agreement for any reason, Paragraph 12 provides as follows:

> (a) Licensee shall immediately discontinue all use of the Licensed Technology except that Licensee shall be permitted to fulfill all orders existing on the termination date, (b) Licensee shall immediately pay to Licensor all amounts payable hereunder with respect to the period prior to termination and Licensee shall promptly pay to Licensor all amounts payable hereunder with respect to the period after termination, and (c) Licensor shall have the right to purchase from Licensee, for a purchase price equal to Licensee's cost less tax depreciation, the Liba Machine and any other machines acquired by Licensee to manufacture Licensed Technology Fabrics.

19.     When the License Agreement was signed in August 2010, Absecon paid Preston $100,000 – and not $125,000, as required by Paragraph 3 of the License Agreement. It was not until January 2011 that Absecon finally paid the remaining $25,000 of the $125,000 payment that was due Preston upon signing.

20.     The Liba machine referred to in Paragraph 12 of the License Agreement is a piece of equipment which was custom-made for Preston by Liba to manufacture Fabrics using the Technology and, as customized, is not suitable for any other purpose.  Thus, Paragraph 10 of the License Agreement describes the Liba machine as a machine "use to manufacture Licensed Technology Fabrics that Liba custom built for Licensor [Preston]."

21.     Preston facilitated Absecon's purchase of the Liba machine that was custom built for him by Liba.

22.     Upon information and belief, Absecon received funding from the ONR in March 2011.  Accordingly, under Paragraph 3 of the License Agreement, the second quarterly minimum guaranteed installment of $125,000 was payable in January 2011, which was 60

days after November 2010, when the second quarterly payment would otherwise have been due.

23.     In January 2011, Absecon did not make the second quarterly $125,000 minimum guaranteed royalty payment required by Paragraph 3 of the License Agreement.

24.     On February 10, 2011, Preston, through his counsel, notified Absecon that Absecon had not paid the minimum annual royalty payment of $125,000 with respect to the second quarter of the first year and was therefore in default under the License Agreement.  (A copy of Preston's February 10, 2011 notice to Absecon is annexed hereto as Exhibit B.)  The notice to Absecon stated that, "[i]f payment of $125,000 is not received by Mr. Preston by February 18, 2011, Mr. Preston will consider what steps to take to enforce his rights under the License Agreement," including "terminating the License Agreement, purchasing the Liba machine, and instituting litigation to collect the balance of the aggregate Minimum Annual Royalty payable over the original ten year term of the License Agreement."

25.     Despite Preston's demand for payment by February 18, 2011, no payment was forthcoming.

26.     Between April 2011, when the third guaranteed quarterly minimum payment was due, and the present time, Absecon was obligated to pay Preston an additional $500,000 in addition to the $125,000 guaranteed quarterly minimum payment due in January 2011.  Instead of making the required $625,000 in payments, Absecon paid Preston only $325,000. Absecon therefore defaulted in making $300,000 of the second, third, fourth, fifth, and sixth guaranteed minimum quarterly payments due under the License Agreement.

27.     Absecon has also failed to provide any statements to Preston showing collections from the sale of Fabrics.

28.     Absecon has conceded that it is in default on its obligation to make minimum guaranteed payments to Preston pursuant to Paragraph 3 of the License Agreement. Annexed hereto as Exhibit C is an e-mail from Absecon to Preston acknowledging that, from inception through February 2012, Absecon owed $750,000 in minimum guaranteed quarterly payments under the License Agreement, but had paid Preston only $450,000, and that it therefore owes Preston at least $300,000.

29.     Preston performed his obligations under the License Agreement by providing Absecon with valuable confidential and proprietary trade secrets which enabled Absecon to use the Technology. At no time prior to February 20, 2012 did Absecon suggest that Preston had failed to perform under the License Agreement or that its default in making timely payment of the minimum guaranteed quarterly royalty was excusable. In fact, Preston was instrumental in any success that Absecon had in exploiting the Technology:  he made and delivered the presentations to ONR that enabled Absecon to obtain a contract for the Fabrics with ONR, and he wrote the statement of work included in the contract between ONR and Absecon.

30.     By notice dated February 16, 2012 (the "Termination Notice"), Preston notified Absecon that he was exercising his right pursuant to Paragraph 2 of the License Agreement to terminate the License Agreement based on Absecon's defaults in making the minimum guaranteed quarterly payments due thereunder.  (A copy of the Termination Notice is annexed hereto as Exhibit D.)  The Termination Notice further demanded that Absecon confirm in writing by February 21, 2012 that all use of the Technology had ceased.  If, however, Absecon intended to exercise its right under Paragraph 12(a) of the License Agreement to fulfill orders existing on February 16, 2012, the Termination Notice stated that

Absecon was required to (a) make payment of all amounts payable under the License Agreement with respect to the period prior to termination and (b) furnish to Preston by February 21, 2012 documentary evidence satisfactory to Preston of Absecon's existing orders, in which case Absecon could continue to use the Technology to fulfill then-existing orders.

31.     In addition, in order to enable Preston to determine whether to exercise his right to purchase the Liba machine which had been customized for use with the Technology, the Notice requested that Absecon furnish Preston with, among other things, information about the cost of the Liba machine less tax depreciation.

32.     As of February 21, 2012, Absecon neither confirmed that it had ceased all use of the Technology nor provided Preston with the payment and information called for in the Termination Notice.  Instead, on February 20, 2012, Absecon's counsel sent a letter denying that it had breached the License Agreement (even though it had previously admitted breaching the License Agreement) and asserting that Preston had not performed under the License Agreement (even though Absecon had never before complained about Preston's performance).

33.     At the time of termination, Absecon owed Preston $300,000 with respect to amounts payable prior to termination and another $4,250,000 for amounts payable with respect to the period after termination.

34.     Based on Absecon's response to the Termination Notice, it appears that Absecon is continuing to use the Technology despite the termination of the License Agreement.  Once the License Agreement terminated, Absecon ceased to have a right to use the Technology, except as provided for in Paragraph 12(a) of the License Agreement.  To the

extent that Absecon is continuing to use the Technology in violation of the terms of the License Agreement, it is misappropriating trade secrets that belong to Preston.

35.     As the licensor of the Technology, Preston has an obligation to ensure that the Technology is used properly and that its status as a trade secret is protected. Absecon's conduct has prevented him from doing so. Absecon has also failed to take adequate steps to maintain the confidentiality of the Technology. This conduct is causing, and, unless enjoined, will continue to cause irreparable injury to Preston.

FIRST CLAIM FOR RELIEF
(Unfair Competition and Misappropriation of Trade Secrets)

36.     Preston repeats and realleges the allegations contained in paragraphs 1 through 35 above as if fully set forth herein.

37.     The Technology is, as Absecon acknowledged in the License Agreement, a trade secret owned by Preston. It was revealed to Absecon on the condition that it be used strictly in accordance with the terms of the License Agreement.

38.     Any right that Absecon had to use the Technology was based on the License Agreement which, by its terms, was subject to early termination by either party after a breach by the other party.

39.     Absecon's failure to make minimum guaranteed quarterly payments totaling $300,000 to Preston constituted a breach of the License Agreement.

40.     Preston exercised his right to terminate the License Agreement on February 16, 2012 based on Absecon's failure to make minimum guaranteed quarterly payments totaling $300,000. Upon Preston's termination of the License Agreement, Absecon ceased to have a right to use the Technology except to the limited extent set forth in the License Agreement.

41.     Absecon has made clear that, notwithstanding Preston's termination of the License Agreement, it intends to continue to use the Technology.

42.     Absecon's continued use and exploitation of the Technology is unauthorized and constitutes unfair competition and the unlawful misappropriation of extremely valuable trade secrets owned and controlled by Preston, in violation of the law of the State of New York.

43.     Absecon's unfair competition and misappropriation of Preston's trade secrets has caused, and continues to cause, irreparable injury to Preston.  Unless Absecon is restrained from continuing to compete unfairly and to use Preston's trade secrets, Preston will be caused irreparable harm, the precise nature of which cannot be proven and for which no adequate remedy at law exists.

44.     The public is likely to be damaged as a result of the conduct of Absecon.

45.     By reason of the foregoing, Preston is entitled to a preliminary and permanent injunction enjoining and restraining Absecon, its servants, agents, employees, attorneys and representatives, and all persons in active concert or participation with Absecon, during the pendency of this action and upon entry of final judgment herein, from directly or indirectly using the Technology.

46.     Absecon has willfully and intentionally engaged in the unlawful conduct described above.  Preston is therefore entitled to an award of punitive damages.

### SECOND CLAIM FOR RELIEF
(Breach of Contract)

47.     Preston repeats and realleges the allegations contained in paragraphs 1 through 46 above as if fully set forth herein.

48.     Preston provided the Technology to Absecon in accordance with the terms of the License Agreement, and Absecon received the benefit of such Technology.

49.     In violation of the terms of the License Agreement, Absecon has failed to pay Preston a total of $300,000 in minimum guaranteed royalty payments due which were payable on or before January 2012.

50.     By reason of the foregoing, Absecon has breached the License Agreement with Preston, and owes Preston an amount equal to at least the $5 million in guaranteed minimum annual royalty payments it agreed to pay Preston over the term of the License Agreement, less the $450,000 in minimum guaranteed quarterly payments previously paid, plus interest.

THIRD CLAIM FOR RELIEF
(Declaratory Judgment)

51.     Preston repeats and realleges the allegations contained in paragraphs 1 through 50 above as if fully set forth herein.

52.     Based on Absecon's failure to make minimum guaranteed quarterly payments totaling $300,000 when such payments were due, Preston notified Absecon on February 16, 2012 that Absecon had breached the License Agreement and that Preston was invoking his right to terminate the License Agreement pursuant to Paragraph 2 thereof, effective immediately.  Preston further notified Absecon that, by virtue of his termination of the License Agreement, Absecon was required to discontinue use of the Technology except to fulfill existing orders, but only if all past due minimum guaranteed royalty payments were made.  Absecon has not paid Preston the past due minimum guaranteed royalty payments and therefore has no right to use the Technology for any purpose, including fulfilling orders existing on February 16, 2012.

53.     The Termination Notice further stated that Preston had the right to purchase from Absecon, for a purchase price equal to Absecon's cost less tax depreciation, the Liba machine customized based on Preston's design for use in manufacturing the Fabrics and any other machines acquired by Absecon to manufacture the Fabrics.

54.     Absecon has denied that its rights under the License Agreement have terminated and has not allowed Preston to purchase the Liba machine or any other machines acquired by Absecon to manufacture the Fabrics.

55.     Preston is entitled to a declaratory judgment establishing that (a) the License Agreement has terminated, (b) Absecon no longer has a right to use the Technology for any purpose, including fulfilling orders existing as of February 16, 2012, and (c) Absecon is obligated to sell to Preston, at a purchase price equal to Absecon's cost less tax depreciation, the Liba machine and any other machines acquired by Absecon to manufacture the Fabrics.

56.     There exists a genuine dispute between the parties concerning Absecon's obligations, and Preston's rights, under the License Agreement.

57.     A judicial declaration is necessary and appropriate at this time under the circumstances to determine the rights and duties of the parties.

WHEREFORE, plaintiff prays for relief and judgment as follows:

(1)     Awarding preliminary and permanent injunctive relief enjoining and restraining defendant, its servants, agents, employees, attorneys and representatives, and all persons in active concert or participation with defendant from directly or indirectly using plaintiff's trade secrets, including the Technology that is the subject of the License Agreement;

(2)     Entering judgment in favor of plaintiff and against defendant awarding

plaintiff compensatory damages in the amount of not less than $4,550,000 plus interest;

(3)     Awarding plaintiff punitive damages in an amount to be determined at trial;

(3)     Entering a declaratory judgment that the License Agreement terminated

effective February 16, 2012, that defendant ceased to have any right to use the Licensed

Technology after February 16, 2012, and that defendant is obligated to sell to Preston, at a

purchase price equal to defendant's cost less tax depreciation, the Liba machine and any other

machines acquired by defendant in connection with the License Agreement; and

(5)     Awarding plaintiff such other and further relief as the Court deems just and

proper, including costs and attorneys' fees.

Dated: New York, New York
       February 24, 2012

                           DUANE MORRIS LLP


                           By: *Fran M. Jacobs*
                                Fran M. Jacobs
                                1540 Broadway
                                New York, NY  10036
                                (212) 692-1000
                                Attorneys for Plaintiff

# EXHIBIT A

License Agreement, dated August 19, 2010, between Daniel Preston ("Licensor") and Absecon Mills, Incorporated ("Licensee").

1.       Licensor hereby grants Licensee an exclusive, worldwide license (the "License") to use certain trade secrets of Licensor (the "Licensed Technology") in the manufacture of fabrics (the "Licensed Technology Fabrics") (a) containing (i) more than two weft insertions, (ii) co-mingled thermo-setting, melt bond, or friction inducing fibers, or (iii) structural z fibers (except that Licensed Technology Fabrics shall not include any fabrics being manufactured by Licensee on the date of this Agreement) or (b) designed by or with the assistance of Licensor.

2.       The term of this Agreement shall be ten years, subject to early termination by either party after a breach of this Agreement by the other party.

3.       There shall be a minimum annual royalty (the "Minimum Annual Royalty") of $500,000, payable by Licensee to Licensor quarterly in advance.  Licensor acknowledges receipt from Licensee of $125,000, representing the Minimum Annual Royalty for the first quarter of the first year.  If Licensee shall have not received funding from the Office of Naval Research on or before the date that the second quarter of the first year would have otherwise commenced, the second quarter of the first year shall commence on, and the second quarterly payable of the Minimum Annual Royalty shall be payable prior to, the earlier of (a) the date such funding is received and (b) 60 days after the date the second quarter of the first year would have otherwise commenced.

4.       Licensee shall pay Licensor a royalty (the "Percentage Royalty") equal to 5% of the gross amount of collections received by Licensee from the sale of Licensed Technology Fabrics ("Collections")  The Percentage Royalty shall be paid not more than 30 days after the end of each calendar quarter with respect to Collections in such quarter.  The obligation to pay the Percentage Royalty with respect to Collections in any calendar year shall be reduced to the extent of the Minimum Annual Royalty paid with respect to such year.

5.       Each payment of the Percentage Royalty shall be accompanied by a detailed statement setting forth how the payment amount was calculated.  Licensor shall have the right to inspect the books and records of Licensee to verify such calculations.

6.       Licensee agrees to defend, indemnify and hold harmless Licensor from, in respect of and against any and all claims, costs, losses, liabilities, expenses (including, without limitation, attorneys' fees and disbursements), judgments, damages, demands, lawsuits or similar actions or proceedings arising out of a third-party claim based on the manufacture, distribution, use or sale of the Licensed Technology Fabrics including, without limitation, all claims for product liability or product defects.

7.       Any improvements to the Licensed Technology, whether made by Licensor, Licensee, or jointly by Licensor and Licensee, shall be owned by Licensor and shall be included in the Licensed Technology licensed under this Agreement.

8.       If requested by Licensee, Licensor may, in his discretion and at Licensee's sole cost and expense, agree to prepare, file, prosecute, and maintain one or more patents (the

"Patents") relating to the Licensed Technology using patent attorneys selected by Licensee. Any Patents shall be in the name of, and owned by, Licensor and shall be included in the Licensed Technology licensed under this Agreement.

9.     Upon the misappropriation or misuse of the Licensed Technology by a third party, or any infringement or suspected or threatened infringement of any Patents, if requested by Licensee, Licensor may, in his discretion and at Licensee's sole cost and expense, agree to institute a legal action to enjoin such misappropriation, misuse or infringement, and to seek appropriate damages in connection therewith. If, after a request by Licensee, Licensor does not agree to institute a legal action to enjoin such misappropriation, misuse or infringement, and to seek appropriate damages in connection therewith, Licensee may, at Licensee's sole cost and expense, institute such a legal action.

10.     Licensor will use his commercially reasonable efforts to cause Liba to sell to Licensee a machine (the "Liba Machine") used to manufacture Licensed Technology Fabrics that Liba custom built for Licensor.

11.     Subject to Licensor's other time commitments, Licensor will devote a reasonable amount of time and use his commercially reasonable efforts to assist Licensee, without additional compensation, in exploiting the Licensed Technology. Such assistance may include participating in engineering presentations and advising with respect to (a) obtaining earmarks and government contracts, (b) formulating a foreign sales strategy, (c) setting up a ballistic test lab, (d) setting up a prototype through production composites facility as well as a technical soft goods facility, (e) staffing, (f) client interface with respect to the engineering of new fabrics, (g) engineering fabrics for best performance in specific applications, (h) designing fabrics and technical soft goods for applications other than ballistics (except parachutes), and (i) media relations.

12.     Upon termination of the Agreement for any reason, (a) Licensee shall immediately discontinue all use of the Licensed Technology except that Licensee shall be permitted to fulfill all orders existing on the termination date, (b) Licensee shall immediately pay to Licensor all amounts payable hereunder with respect to the period prior to termination and Licensee shall promptly pay to Licensor all amounts payable hereunder with respect to the period after termination, and (c) Licensor shall have the right to purchase from Licensee, for a purchase price equal to Licensee's cost less tax depreciation, the Liba Machine and any other machines acquired by Licensee to manufacture Licensed Technology Fabrics.

13.     Nothing herein contained shall be construed to place the parties in relationship of partners or joint venturers, and Licensee shall have no power to obligate or bind Licensor in any manner whatsoever.

14.     This Agreement and the confidentiality agreement entered into by the parties prior to the date hereof constitute the entire agreement between the parties pertaining to the subject matter hereof and supersede all prior agreements between the parties.

15.     This Agreement and the License shall not be assignable by Licensee, except that, with the consent of Licensor, which consent shall not be unreasonably withheld, Licensee may

2

assign this Agreement and the License to an entity that succeeds to all or substantially all of the business of Licensee.

  16. This Agreement shall be construed in accordance with laws of the State of New York, without regard to the conflict of laws or choice of laws principles. The parties agree that any action brought by either party related to this Agreement shall be brought in any court of the State of New York, or any Federal court, located in the State of New York, County of New York, and each of the parties irrevocably consents to the jurisdiction of any such court in connection with any such action, and each party irrevocably waives any objection to venue or any claim that the action is brought in an inconvenient forum.

_____

Daniel Preston

Absecon Mills, Incorporated

By_____

3

assign this Agreement and the License to an entity that succeeds to all or substantially all of the business of Licensee.

16.     This Agreement shall be construed in accordance with laws of the State of New York, without regard to the conflict of laws or choice of laws principles. The parties agree that any action brought by either party related to this Agreement shall be brought in any court of the State of New York, or any Federal court, located in the State of New York, County of New York, and each of the parties irrevocably consents to the jurisdiction of any such court in connection with any such action, and each party irrevocably waives any objection to venue or any claim that the action is brought in an inconvenient forum.

_____
Daniel Preston


Absecon Mills, Incorporated

By _____


*Note: correction to paragraph # 3 payment is only $100,000 as of today's date*

# EXHIBIT B

DuaneMorris®

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
SINGAPORE
LOS ANGELES
CHICAGO
HOUSTON
HANOI
PHILADELPHIA
SAN DIEGO
SAN FRANCISCO
BALTIMORE
BOSTON
WASHINGTON, DC
LAS VEGAS
ATLANTA
MIAMI
PITTSBURGH
NEWARK
BOCA RATON
WILMINGTON
CHERRY HILL
PRINCETON
LAKE TAHOE
HO CHI MINH CITY

ROBERT J. HASDAY
DIRECT DIAL: +1 212 692 1010
PERSONAL FAX: +1 212 202 6059
E-MAIL: rjhasday@duanemorris.com

www.duanemorris.com

February 10, 2011

Via E-Mail (rtaylor @absecon.com) and First Class Mail

Absecon Mills, Incorporated
Vienna & Aloe Avenues
P.O. Box 672
Cologne, New Jersey 08213-0672
Attention: Randolph S. Taylor
            President and CEO

Re:  License Agreement, dated August 19, 2010 (the "License Agreement"), between
     Daniel Preston and Absecon Mills, Incorporated (Absecon")

Gentlemen:

Our firm is counsel to Daniel Preston.

We understand that Absecon has not paid Mr. Preston the Minimum Annual Royalty (as defined in the License Agreement) of $125,000 with respect to the second quarter of the first year. Such payment would have been due by November 18, 2010, but because Mr. Preston agreed to a 60 day delay in payment if Absecon did not receive funding from the Office of Naval Research, such payment was due by January 17, 2011.

If payment of $125,000 is not received by Mr. Preston by February 18, 2011, Mr. Preston will consider what steps to take to enforce his rights under the License Agreement. Such steps may include, but are not limited to, terminating the License Agreement, purchasing the Liba machine, and instituting litigation to collect the balance of the aggregate Minimum Annual Royalty payable over the original ten year term of the License Agreement. Nothing in this letter shall constitute a waiver of any of Mr. Preston's rights under the License Agreement or otherwise, all of which are preserved.

Very truly yours,

Robert J. Hasday

# EXHIBIT C

**From:** Gaily Von Schlichting <gvons@absecon.com>
**Date:** Thu, 9 Feb 2012 12:16:08 -0800
**To:** Daniel Preston <dan@cacaoholdings.com>
**Subject:** Afternoon Update

Dear Daniel,

If this seems overly "factual", I'm not trying to be officious; it just seems like the best way to explain the financials as I see them.

The agreement was signed on August 19th, 2010, which I am assuming is the beginning of the contract. There was a $125,000 payment due for the 1st quarter (which I am counting as August, September and October).

The agreement says (in paragraph 3):

"If Licensee shall not have received funding from the Office of naval Research on or before the date that the second quarter of the first year would have otherwise commenced, the second quarter of the first year shall commence on, and the second quarterly payable of the Minimum Annual Royaltyshall be payable prior to, the earlier of (a) the date such funding is received and (b) 60 days after the date the second quarter of the first year would have otherwise commenced."

Since we didn't receive funding until March of 2011, the second quarter of the first year (which would have normally commenced in November) Began in January of 2011, due to the sixty day grace period. Therefore on January 1, 2011, you should have received a payment of $125,000. The remaining quarterly payments to date would be April 1, 2011, July 1, 2011, October 1, 2011 and January 1, 2012.

Six payments of $125,000 amounts to $750,000. Please note the payments below amount to $450,000, leaving a balance of $300,000 as opposed to your accountant's calculation of $480,000

| | |
|---|---|
| Initial payment in 2010 | $100,000 |
| 1-20-2011 | $ 25,000 |
| 4-01-2011 | $ 25,000 |
| 4-20-2011 | $ 10,000 (Check) |
| 6-10-2011 | $125,000 |
| 8-17-2011 | $ 50,000 |
| 11-17-2011 | $ 20,000 |
| 1-12-2012 | $ 50,000 |
| 2-6-2012 | $ 45,000 |
| | $450,000 |

Let's get this straightened out first so we can resolve this in the quickest way possible. Again, I did not get to speak with Randy today. He is really very sick, but promises me that we can discuss this tomeoorow and get back to you. For now, I almost feel it's better if you and I communicate. It's never contentious between us, and I just feel that my mediation makes things go more reasonably. I have agreat amount of respect for you and for Randy as well. Dennis is incredibly stressed out and I'm really trying hard to please everyone. I appreciate your willingness to have a dialog with me.

Let me know what your accountant comes up with after looking at the payments.

Thanks and regards,

Gaily

--
Gaily Von Schlichting

# EXHIBIT D

Daniel Preston
160 Coffey Street
Brooklyn, NY 11231

February 16, 2012

<u>Via E-Mail (rtaylor@absecon.com) and First Class Mail</u>
Absecon Mills, Incorporated
Vienna & Aloe Avenues
P.O. Box 672
Cologne, New Jersey 08213-0672
Attention:  Randolph S. Taylor
　　　　　　　President and CEO

Re:  License Agreement, dated August 19, 2010 (the "License Agreement"), between
　　　<u>Daniel Preston ("Licensor") and Absecon Mills, Incorporated ("Licensee")</u>

Gentlemen:

By e-mail to me dated February 9, 2012, Gaily Von Schlichting, Director of Communications of Licensee, acknowledged repeated, material, and continuing breaches of the License Agreement by Licensee with respect to Licensee's obligation to pay Licensor the Minimum Annual Royalty (as defined in the License Agreement).

Section 2 of the License Agreement provides that the License Agreement is subject to early termination by either party after a breach of this Agreement by the other party.  You are hereby notified that the License Agreement is hereby terminated, effective immediately, pursuant to the provisions of Section 2.

Section 12 of the License Agreement provides that upon termination of the License Agreement for any reason, (a) Licensee shall immediately discontinue all use of the Licensed Technology (as defined in the License Agreement") except that Licensee shall be permitted to fulfill all orders existing on the termination date, (b) Licensee shall immediately pay to Licensor all amounts payable under the License Agreement with respect to the period prior to termination and Licensee shall promptly pay to Licensor all amounts payable hereunder with respect to the period after termination, and (c) Licensor shall have the right to purchase from Licensee, for a purchase price equal to Licensee's cost less tax depreciation, the Liba Machine (as defined in the License Agreement) and any other machines acquired by Licensee to manufacture Licensed Technology Fabrics (as defined in the License Agreement).

Since the License Agreement has been terminated, Licensor hereby demands that Licensee confirm in writing by no later than February 21, 2012 that all use of the Licensed Technology by Licensee has ceased.  In the event that Licensee intends to exercise its right under Section 12(a) of the License Agreement to fulfill orders existing on the date hereof which require use of the

Absecon Mills, Incorporated
February 16, 2012
Page 2

Licensed Technology ("Existing Orders"), Licensee must (a) make immediate payment to Licensor of all amounts payable under the License Agreement with respect to the period prior to termination and (b) furnish to Licensor by February 21, 2012 documentary evidence, satisfactory to Licensor, of the Existing Orders, in which case Licensee may continue to use the Licensed Technology, subject to the terms and conditions of the License Agreement, solely to fulfill the Existing Orders.  If, by February 21, 2012, Licensee has neither confirmed that it has ceased all use of the Licensed Technology nor provided the payment and evidence referred to in the prior sentence, Licensor will have no choice but to conclude that Licensee is continuing to use the Licensed Technology in violation of the License Agreement, in which case Licensor reserves his right to take appropriate steps.

To enable Licensor to determine whether to exercise his rights pursuant to Section 12(c) of the License Agreement, Licensee is requested to furnish to Licensor, as soon as practicable after the date hereof, (a) Licensee's cost less tax depreciation of the Liba Machine and (b) if Licensee has acquired any other machines to manufacture Licensed Technology Fabrics, Licensee's cost less tax depreciation, and a detailed description, of such other machines.

Nothing in this notice shall constitute a waiver of any of Licensor's rights under the License Agreement or otherwise, all of which are preserved.  Without limiting the generality of the foregoing, Licensor will commence litigation against Licensee if Licensee has not paid to Licensor by February 21, 2012 all amounts payable under the License Agreement with respect to the period prior to termination.

Very truly yours,

/s/

Daniel Preston


cc: Craig J. Williams, Esq. (via e-mail (jdinvest82@aol.com))
cc: Gaily Von Schlichting (via e-mail (gvons@absecon.com))