UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL PRESTON,<br><br>　　　　　　　　　　Plaintiff,<br><br>　-against-<br><br>ABSECON MILLS, INC.,<br><br>　　　　　　　　　　Defendant. | 12 CV 1393 (ALC)(JLC)<br><br>DECLARATION OF RANDOLPH S. TAYLOR PURSUANT TO 28 U.S.C. § 1746 IN SUPPORT OF ABSECON'S OPPOSITION TO PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |

　　　　I, Randolph S. Taylor, declare that I have personal knowledge of the following facts and that they are true and correct:

**Introduction**

　　　　1.　　I am the President and CEO of the Defendant, Absecon Mills, Inc. (hereinafter, "Absecon" or "the company") and have been the company's president for over 26 years and the company CEO for 16 of those years. I have also been involved in many of its service contracts with the United States military. I make this declaration in opposition to Plaintiff Daniel Preston's ("Preston" or " Plaintiff") motion for a temporary restraining order and preliminary injunction.

　　　　2.　　As will be discussed below, Preston's declaration is filled with misstatements, including but not limited to, about my company, our experience, our manufacturing of ballistic fabrics, the history of this matter, what he did in connection with this matter, about his alleged trade secrets and technology information (which is not even defined or detailed) he allegedly provided to us and we dispute, whether he did provide trade secrets to us as he had initially promised, the history and application of the License Agreement between him and my company, and the history of the confidentiality agreement he attaches to his papers, which is not even with

1

him, but another company. He fails to demonstrate that we have misappropriated his purported trade secrets and what they are and how we are currently using his purported trade secrets – which we deny. He misstates that he will suffer irreparable harm if no injunction is issued.

3. But especially untrue are his representations that an injunction would not cause irreparable harm to my company, to my employees, or to Absecon's customer, ONR. He seeks this injunction to destroy the business of my company. He has been disparaging my company to ONR and to my employees, seeking to disrupt and interfere with my contracts and obtain my company information to disclose to others. There is no doubt in my mind that he would take this injunction order to ONR and to my employees and others to destroy my business under the false claims I have misappropriated his trade secrets and am using them, that I cannot complete my contracts, that my business will close, and that my employees will not have a job. He has already done this when he served the letter terminating the License Agreement and sent it to ONR and communicated with my employees on this subject without my Company's permission.

4. Absecon will suffer irreparably if this injunction issues. He seeks to prevent me from completing my contract with ONR and providing soft armor technologies created by my own company and our employees to our military and fighting men. He suffers no irreparable harm if the injunction is denied while the litigation continues. He cannot even complete our contract, despite his assertions, and has never even used the Liba Machine we obtained from American Liba, Inc. (hereinafter, "Liba"). Preston is not a party to our contract with Liba. Preston is not the responsible party in our contract with ONR. A denial of this injunction simply preserves the status quo. My company will suffer the overwhelming balance of any hardships compared to Plaintiff if this injunction issues. His reputation and loss of goodwill are not in

danger. My company's reputation and ability to enter into new military contracts is in certain danger if this injunction is issued.

**My Company, Absecon**

5. Absecon takes great pride in our products; we have been in business for more than 40 years, and have never defaulted on a contract. During my time at Absecon, the company has begun to focus on being a leading supplier of affordable high performance fabric solutions for protective gear. Absecon is a family business with a long military history, founded and owned by Veterans. We are committed to providing the highest quality service to our military clients, especially those who fight on behalf of the United States, domestically and abroad. I speak on behalf of the company in saying that Absecon takes great pride in the fact that it is considered a trusted and reliable supplier of key military textile technologies that will benefit the servicemen and servicewomen who fight for the United States.

6. Preston states falsely that my company had not dealt with military contracts. In my capacity as a President and CEO, I have overseen numerous defense contracts between Absecon and other United States military entities, including designing and installation of fabrics for the T-130 Aircraft for the United States. I have also spearheaded the design and production of fabrics for military housing currently used by soldiers worldwide. Absecon's successful business in military defense projects, such as the ones previously mentioned, is due largely to its scores of employees, including specialists in the areas of fabric sciences, textile engineering and government/regulatory contracts. Preston states falsely that my company has no engineers. In fact, Absecon's employees not only include engineers such as John Von Hess and William Spano (who holds an engineering degree from Auburn University) but many employees that have been with Absecon for 20 years or more and have worked on ballistics weaving. In fact, in

Mr. Spano's case, he is actually more qualified than Preston, as Spano holds an engineering degree, which Preston does not.

7. Under my leadership, Absecon has never failed to meet the deliverables required under any of its contracts with United States military clients. In fact, Absecon prides itself on seeking the most cost efficient and technically effective solutions in fulfilling our part of our military contracts. Absecon always maintains its client's interests throughout any project and always seeks to do what is best for that client.

8. In late 2009, with the assistance of Absecon's Director of Communications, Gaily Von Schlichting, I submitted a proposal to New Jersey State Representatives Rob Andrews, Frank LoBiondo and Steve Rothman and New Jersey Senators Frank Lautenberg and Robert Menéndez for Congressional funding of $2,000,000 for "Non Traditional Weaving Application for Aramid (Ballistic) Fibers and Fabrics". At that time, I was seeking to utilize Absecon's core competencies in fabric development to provide the United States Military a new type of body armor for soldiers that was light weight and provided increased ballistics protection. Preston falsely states he obtained funding for Absecon for this project. He had nothing to do with this funding. I had not even met Preston at the time Absecon was granted funding.

9. William Spano ("Spano"), a textile engineer at Absecon, had put me in contact with a company capable of implementing multi-axial weaves of the type Spano, I and other Absecon employees envisioned for use in a future government contract. Spano introduced me to someone whom he had met during his time making antiballistic fabrics, Christian Wienands. Mr. Wienands is the president of American Liba and he offered the use of his company's customized fabric manufacturing machine (hereinafter, the "Liba Machine"). He also suggested that I consider Daniel Preston ("Preston") as someone who might support Absecon's antiballistic

4

fabrics project.  Preston falsely states he introduced Absecon to Liba.  We had discussions with Liba before we ever met Preston, and it was Christian Wienands who first mentioned Preston to us.

**Contact With Daniel Preston**

10. Preston notes without much explanation a confidentially agreement he had me sign and attaches it.  It was not even with Preston, but with Cacao Biotechnologies Inc., (hereinafter "Cacao"), a company Preston said he has an interest in but which was not a party to the License Agreement.  The confidentiality agreement I signed did not state what the confidential information was or would contain.  [Exhibit J to Preston Declaration].  According to the confidentiality agreement, Cacao was to reduce to writing all such Confidential Information orally disclosed to me within 30-days after such disclosure.  The company or Preston never provided a written list to me.

11. Preston makes it seem like he engaged in many meetings with my company and my employees.  He had few and did not follow up with information we needed to assist us.  In a meeting between Preston, Christian, David Adair and me, Preston allowed me to glance at a sample of fabric that he purported to have made using his own means.  Preston represented to me that he was the inventor of the fabric, which he claimed possessed extraordinary antiballistic capabilities.  As of the date of my signing this declaration, I have never received any data from Cacao or Preston that could be relied on in the antiballistic fabrics industry to substantiate the representations made to me by Preston at our June 2010 meeting.  Moreover, he promised to send us the fabric because he would not let us keep it at that time. For months, we asked for that fabric, so we could begin understanding exactly what his technology was. It was never sent. Gaily Von Schlichting again requested this sample before the Progress Review meeting with

ONR, stating that we needed it, as we had no other example of the technology. After finally agreeing to do so, he sent us a completely different sample, one that was not even constructed on Absecon's Liba machine. Ms. Von Schlichting then requested him to have someone in his office (as he was out of the country by this time) overnight the correct sample at Absecon's expense. This was never done.

12. Preston represented to me that he had experience with government contracts with a prior company, Atair Aerospace, Inc. ("Atair"). He also represented that he was overwhelmingly successful with previous contracts. I did not learn until February 29, 2012 that while at Atair, Preston actually had contractual disputes with a canopy supplier, Butler Parachute Systems, Inc. ("Butler") involving allegations that Preston stole canopy technologies provided by Butler to Atair under their contract. I learned this from an email sent to an Absecon employee who knows Manley Butler personally. [Exhibit 1 of the Taylor Declaration]. Preston claims his reputation would be damaged if this injunction does not issue, which I vehemently dispute, but he already has a bad reputation that I was totally unaware of.

13. After our initial meeting, I relied on Preston's willingness to assist Absecon in accomplishing its antiballistic fabrics project. Based on my trust in Preston's representations to me during our June 2010 meeting, I, on behalf of Absecon, entered into a license agreement with Preston on August 19, 2010 (the "License Agreement"). He drafted the agreement and it turned out that this technology was not subsequently defined nor specified, and he never delivered technology we could use. He did not perform as promised under the agreement including his important obligations under Paragraph 11 of the License Agreement [Exhibit B to the Preston Declaration]. As the accompanying declarations of David Adair, John Von Hess, William Spano and Gaily Von Schlichting state, my employees had to use their own knowledge of and expertise

6

in ballistics fiber and ingenuity and creativity to create the fabric Preston now seeks to enjoin us from using, even though it is solely Absecon's technology.  He is not in this business.  He does not dispute his current focus is on cocoa beans.  However, it became clear that Preston is now seeking investors to take over my company.  He brought them into my facilities without identifying them in advance, gave them improper access to the LIBA machine in our secured section of the building, and secretly met with my employee without my knowledge and permission.  He also induced my employee to give him confidential information without my knowledge or permission, by asking him to bring one of our shoot packs to Brooklyn so Preston could see it.

**Absecon Wins The ONR Contract**

14.     Within a month of the License Agreement, a group of individuals from Absecon, which included William A. Spano, Gaily Von Schlichting, Carol Miller and myself, prepared a proposal in response to a solicitation from the Office of Naval Research (ONR).  This solicitation was critical to fully realize the congressionally approved Absecon antiballistic fabric project.  The Absecon team worked together on every single page of a two volume Technical and Cost Proposal (the "ONR Proposal") prepared for Dr. David Shifler ("Shifler") at ONR.

15.     The ONR Proposal clearly made Absecon solely responsible for completion of all the tasks associated with meeting ONR's requirement for antiballistic fabrics.  All testing and production of antiballistic fabrics would take place on Absecon's premises, except the certified testing, which would be carried out at a government sanctioned and certified testing facility.  I assumed responsibility of overall program accountability as the Program Manager.  I assigned William Spano to the position of Deputy Program Manager, placing him with the monumental task of identifying the system level requirements for the project, designing the test procedures of

antiballistic samples and evaluating sample performance against relevant regulations and standards.  As Absecon's Program Specialist, Gaily Von Schlichting would handle all contractual matters between Absecon and third parties who would assist in Absecon's antiballistic fabrics project for ONR.  Finally, Absecon devoted its own skilled machinists and technicians, Charles Michel, Matthew Tice and John Von Hess, to the challenging task of being trained to operate the Liba Machine and ultimately fabricate the end product of Absecon's antiballistic fabrics project.  I would have been remiss to have personnel lacking the requisite weaving, warping and textile machine knowhow try and fabricate Absecon's antiballistic fabric.  In fact, Charles Michel had been working exclusively with Spano for several months on Absecon's other ballistics projects.

16.     Based on Preston's representations of his innovative capabilities, I thought it best to keep Preston in a consultant role as the Principal Investigator of Absecon's antiballistic fabric project, but he has repeatedly failed even to do this or to assist Absecon as needed.  He failed to show up at a critical meeting with ONR, for example.  He refused to attend meetings if they interfered with his cocoa business, but he did seek to ingratiate himself with Dr. Schifler with emails and/or phone calls disparaging Absecon.  He sent Dr. Shifler and our other program directors at ONR the termination letter of the License Agreement and has communicated with him to the point where Shifler now questions the direction of our project without Daniel Preston.  He is not the Project Manager.  Preston never submitted any hours to Gaily Von Schlichting or me to show what work, if any, he had done to assist Absecon in its endeavors.  Preston also didn't seem to take an interest in the amount of effort Absecon's employees were contributing to ensure an award of a contract with ONR.  I observed that during the preparation of the ONR Proposal, while Gaily Von Schlichting and Bill Spano worked tirelessly to finalize the technical

and cost sections, Preston only managed to contribute information for Absecon's three page statement of work, the entirety of which was drafted by Carol Miller and Gaily Von Schlichting. His contribution to the line item costs for the project were equally dismal.

17. Before the writing of the complete ONR Proposal I refer to above, I had made arrangements to give a presentation to ONR in Washington, D.C., (the "ONR Presentation"), discussing the goals and milestones of Absecon's antiballistic fabrics project. I had asked Preston as Principal Investigator to contribute to this endeavor as well. However, Preston provided us with information to fill a mere five (5) slides in the final ONR Presentation, which was completely handled by Absecon's employees.

18. In November 2010, ONR agreed to fund Absecon's antiballistic fabrics project. Months later, on March 1, 2011, the diligent efforts and expertise of Absecon's employees, borne out through Absecon's ONR Proposal and the ONR Presentation, achieved the contract with ONR to pursue Absecon's antiballistic fabrics project for the United States military (the "ONR Contract"). This contract was, and is, between Absecon and ONR and Daniel's only role in the contract is as Principal Investigator, a role he did not fulfill. It is Absecon and its reputation at issue in fulfilling this contract. Contrary to what he asserts, Daniel's reputation cannot be harmed, as Absecon is well on its way to completing this contract and delivering the milestones and data required by ONR.

**The Cooperative Relationship Of American Liba And Absecon**

19. Having finally received the ONR Contract, I reconnected with Absecon's contact at American Liba Inc., Christian Wienands, to discuss the terms of a contract ensuring Absecon's access to a dedicated fabric assembly device for its antiballistic fabrics. On March 12, 2011, I signed a purchase contract, on behalf of Absecon, with American Liba for the purchase of the

9

Liba Machine (the "Liba Contract"). The Liba Contract does not permit Absecon to own the Liba Machine until the full purchase price of the Liba Machine is paid. Until that time, American Liba is the only entity that owns the Liba Machine. [*See* Exhibit C of the Preston Declaration]. Absecon requested the Liba Machine be shipped as soon as possible, but then we had the devastating fire on April 3rd, making it impossible to bring the machine to our facility until the area housing the machine was fully repaired and cleaned.

20. Christian has told me that he and his company are the inventors of the Liba machine and its technology and that Preston has no ownership rights to the machine or the technology in the machine. Preston, as noted, is not a signatory to the Liba contract. Liba was responsible for the training of the Absecon employees and assisting in setting up the machine. I am informed and the accompanying declaration of John Von Hess states that when Daniel looked at the Liba machine at Absecon (on one of his rare visits), he said the Liba machine at Absecon "was not his machine."

21. Absecon had to overcome adversity when on April 3, 2011, shortly before American Liba committed to ship the Liba Machine, Absecon's facilities were struck by a natural disaster in the form of a fire. Out of concerns for safety for its employees and preservation of existing technological work products, Absecon shut down its operations during the time the fire was affecting the premises. Following a collective effort of more than 27 fire station units to put out the fire, Absecon still persevered to keep its invitation to ONR's Shifler that was scheduled for the following week. Shifler allowed Absecon an extension of time for the machine installation and the milestone deliverables. He also understood that performance under the ONR contract would likewise be extended to account for the recent natural disaster which

affected Absecon's facilities.  American Liba extended the same type of consideration and sent the Liba Machine to Absecon sometime after their recovery from the fire.

22.     Christian Wienands and his staff at American Liba, Inc.  where the only individuals to assist Absecon in training to use, modify and otherwise configure the Liba Machine.  I do not believe Preston knows how to operate the Liba Machine nor instruct how to configure it to achieve any desired result.  No Absecon employee has ever been instructed by Preston on how to use the Liba Machine.  During his total of four visits to Absecon's premises, Preston has never operated the Liba Machine.

23.     Because Preston could not assist Absecon in using the machine that would be responsible for implementing Absecon's antiballistic fabric technology, I gave approval for employees to "start from scratch" to achieve the goals presented in the ONR proposal. Given that Preston was unable to help us calibrate, set up or run the Liba Machine, Absecon employees, with the help of American Liba engineers, independently reconfigured the Liba Machine to implement Absecon's own proprietary technologies and processes.  These proprietary technologies and processes were developed by Absecon employees, including William Spano and John Von Hess.  Those independently developed technologies and processes are currently being used by Absecon to meet the deliverables under the ONR Contract.  We are not using trade secrets of Preston.  He never gave us the know how to operate the Liba Machine.  Even Preston admitted in his declaration, except for his former employee Dennis Walsh, "I had not taught anyone the entire design process and construction methodology used in the Technology." Dennis Walsh came to Absecon as an employee ¾ of the way through the contract to work on the project. He had lost his job and Preston assured me he would be an asset to the project.  Since Preston's request for an injunction, he has been pressuring Walsh, telling him the work was over

11

and he would lose his job, and placed Dennis Walsh and others under great stress. Absecon even agreed to reassign Walsh, who is a decorated war veteran, to relieve this stress. It was Walsh that Preston took out of the building, and had him talk privately with investors. The stress has led Walsh to as of now leave Absecon since he felt torn by Preston's earlier relationship and his current job at Absecon.

**Payments Under The License Agreement With Preston**

24. In exchange for Preston's promise to disclose to Absecon this information for manufacturing certain products enumerated in Paragraph 21, above, Absecon was to pay Preston $500,000 per year in quarterly installments, with $125,000 due for the first quarter for the first year. When I signed the License Agreement, I annotated it to reflect that I was only paying $100,000 to Preston for the first quarter for the first year. Preston acknowledged this written change to the License Agreement and Preston permitted me to send the remaining $25,000 that was due on August 19, 2010 by the first or second day in December 2010. [Exhibit 2 of the Taylor Declaration]. Preston and I continued this partial payment plan from December 2010 to January 2012. Preston agreed to this payment plan until February 9, 2012 when he characterized the partial payment plan as Absecon "being in default of our contract from the very beginning." [Exhibit 3 of the Taylor Declaration]. Preston misrepresented how much was owed by Absecon. He said it was $480,000 when it was $300,000 which Absecon would have paid. The February 9 letter he cites was not an admission of default but a statement to show was had up to that point been paid and not paid and that Preston had misstated the amount owed. A week later, on February 17, 2012, Preston abruptly terminated the August 19, 2010 License Agreement with Absecon. [Exhibit D of the Preston Declaration]. Absecon's counsel responded to the notice with his letter of February 20, 2012. [Exhibit B of the Jacobs Declaration].

25. Up to and including the point when Absecon's contract with Preston was terminated, Preston frequently threatened to, and in fact did bring the event of his termination of the License Agreement to the attention of third parties with whom Absecon had contracted to do work. Preston sent e-mails to ONR and spread rumors to Christian Wienands at American Liba, that Absecon was in default and the Liba Machine would be, in effect, repossessed by Preston. [Exhibits 3 and 4 of the Taylor Declaration].

**Irreparable Harm**

26. I have already stated above the irreparable harm that would result to Absecon if this injunction is issued and explained that Preston, despite his statement, will not suffer irreparable harm if the injunction is denied. Absecon has not misappropriated Preston's ill-defined technology and so-called trade secrets and our continuing to provide the material to ONR will not in any way cause him irreparable injury. He says we cannot succeed without him but we have been doing so. He has not shown how he will suffer "irreparable injury" if Absecon and his employees continue to work as it is doing now. With the ballistics industry being a tight-knit community, I am incredibly alarmed and worried that as a result of Preston's inflammatory comments, Absecon faces the risk that if this injunction issues it is our reputation that will be ruined and ONR may seek to cancel the contract.

**Absecon's efforts to protect confidential information**

27. Preston falsely claims that Absecon has no security measures in place and misdescribes even where the Liba machine is stored and used. Absecon has policies and procedures requiring its employees to adhere to confidentiality and secrecy rules. Visitors are required to sign in. The Liba machine is stored in its own area with signs saying that only authorized personnel are to be admitted. Preston falsely states that widows are not blacked out.

The building has no windows.  He says doors are left open. This is not true and he is not there enough to state this.  Secrecy and confidentiality are incredibly important to Absecon.  He refers to foreign nationals who are not named and which Absecon denies.  It is Preston who recently took two unauthorized investors to Absecon's facilities without my knowledge to see the machine and ask our employees questions. It is Preston who secretly met with the investors and took Walsh out to lunch and Preston who also spoke with John Von Hess about the machine operations in front of these people.  As to Preston's so-called trade secrets, he provided no such agreement for example with Christian at Liba who stated that the technology on the Liba machine was owned by Liba.

28.     The notion that because Absecon did not pay amounts under the License Agreement shows it could not pay money damages is baseless.  Absecon is a successful company with almost 100 employees as noted.  It is the injunction that would irreparably harm Absecon.  It has made all its required substantial payments to Liba.

**Preston's Failures Under The License Agreement**

29.     Absecon contracted with Preston because of what Preston represented were his novel ideas related to "trade secrets." However, Preston has never communicated to me the precise details of his trade secrets as stated in the License Agreement at Paragraph 1.  Further, I do not know what the Licensed Technology is according to the License Agreement.  As of the date of this declaration, Preston has never reduced to or described in writing within thirty (30) days after oral disclosure any purportedly Confidential Information pursuant to Confidentiality Agreement § 2.2.1(b).

30.     Public information--after two decades of experience in antiballistic fabric technologies, I, as well as others, such as David Adair, Bill Spano and John Von Hess, who are

Absecon's employees, know that manufacture of fabrics containing more than two weft insertions was publically known to those in the antiballistic fabrics industry, including Absecon, before August 19, 2010.

31. After two decades of experience in antiballistic fabric technologies, I, as well as others, such as David Adair, Bill Spano and John Von Hess, know that manufacture of fabrics containing co-mingled thermo-setting, melt bond or friction inducing fibers was publically known to those in the antiballistic fabrics industry, including Absecon, before August 19, 2010.

32. After two decades of experience in antiballistic fabric technologies, I, as well as others, such as David Adair, Bill Spano and John Von Hess, knew that manufacture of fabrics containing structural z fibers was publically known to those in the antiballistic fabrics industry, including Absecon, before August 19, 2010.

33. I am unaware of Preston ever providing to Absecon or its employees any of the trade secrets or the so-called license Technology in the manufacture of fabrics identified in Paragraph 1 of the License Agreement. Absecon has and continues to rely on its own technologies and proprietary processes to fulfill milestones under the ONR Contract. Indeed, as noted, Preston admits that "[u]ntil very recently when I trained [Dennis] Walsh, I had not taught anyone the entire design process and construction methodology used in the technology." [Preston Decl. at ¶32]. No one at Absecon is using any of Preston's alleged trade secrets.

34. According to Paragraph 11 of the License Agreement with Absecon, Preston had agreed to:

> devote a reasonable amount of time and use his commercially reasonable efforts to assist Licensee, without additional compensation, in exploiting the Licensed Technology. Such assistance may include participating in engineering presentations and advising with respect to (a) obtaining earmarks and government contracts, (b) formulating a foreign sales strategy, (c) setting up a ballistic test lab, (d) setting up a prototype through production composites facility as well as a technical soft goods facility, (e) staffing, (f)

>client interface with respect to the engineering of new fabrics, (g) engineering fabrics for best performance in specific applications, (h) designing fabrics and technical soft goods for applications other than ballistics (except parachutes), and (i) media relations.

[Exhibit A of the Preston Declaration at ¶11].

35. Preston has failed to devote a reasonable amount of time and use his commercially reasonable efforts to assist Absecon under Paragraph 11. Aside from his apathy in assisting Absecon on its ONR Proposal and ONR Presentation, Daniel has missed important meetings with ONR notice to Absecon or ONR. He outright declined to provide the requested first cut matrix for James Mackiewicz of the U.S. Naval Health Research Center. Daniel has been a hindrance in certain respects due to his confrontational nature.

36. Preston's smear campaign against Absecon has already been so unbearable for Dennis Walsh, one of Absecon's employees. As noted the employee has chosen to refrain from working at the company until these issues are resolved.

37. Notwithstanding his obligations under Paragraph 11 of the License Agreement, Preston has never setup a ballistic test lab and he has not setup a prototype through production composites facility and a technical soft goods facility. The superior technical capabilities of Absecon's employees William Spano and John Von Hess have more than compensated for Preston's absence on this part of his bargain with Absecon. The limited staffing Preston arguably accomplished by bringing Dennis Walsh to my attention has recently been undone by his negative advertising of Absecon. I view the aspersions cast upon Absecon as a company and upon me personally to amount to deliberate steps to interference with my company's employees, my company's projects, and ultimately the future success of the company in the years to come. The irreparable harm caused by this injunction being issued to Absecon's more than 40 year record of excellence in the high quality and military provider market would be trumpeted by Preston . When Absecon's success in finishing its provision of fabric to ONR, and it is close to

finishing, our fighting men will be closer to enhancing the protection of their lives.  Preston speculates with no existing facilities or current know how, about protecting the service men's lives, Absecon works everyday using its own knowledge and technology it developed to achieve this goal.

38. Thus, as Absecon assumes all the risk under the ONR Contract, the Liba Contract and the responsibilities flowing thereunder, the threat of an injunction by Preston is not only detrimental to Absecon's current business relationships, but it will negatively impact future capabilities to supply Absecon's antiballistic fabrics to military personnel through ONR.  Absecon is ready and willing to meet the demand for antiballistic fabrics under the ONR contract and has the specially designed in-house technology necessary to solve the need for light-weight antiballistic body armor.  Preston has decided to seek to destroy Absecon's business and on-going work by this quick strike of seeking an injunction falsely claiming Absecon will "benefit" and he will suffer irreparable harm on the unsupportable premise Absecon will not succeed.  Although he is trying to disparage Absecon with ONR and others, Absecon has its own know-how and is succeeding.  When it does, Preston faces no risk.

39. Preston's concern for our country's military personnel is disingenuous at best when he knows full well that his technical inexperience with the Liba Machine would only further delay the provision of Absecon's lifesaving fabrics to war fighters.  His motion for an injunction against Absecon, a supplier of such beneficial products to our country's defenders smacks of hypocrisy. Preston's request for an injunction is to protect his own personal interests and not those of the public which Absecon has and continues to diligently serve.

40.     For the reasons set forth above and in the accompanying declarations of Absecon employees and the memorandum of law, I respectfully request that the Court deny Daniel Preston's motion for a temporary restraining order and preliminary injunction.

I declare under the penalty of perjury under the laws of the United States of America.

Dated: March 8, 2012 in Phoenix, Arizona

*Randolph S. Taylor* (signature)

Randolph S. Taylor